Good morning, your honors. May it please the court, I'm Peter Henderson. I'm here on behalf of Michael Flournoy today. As an initial matter, the parties agree this case needs to be remanded for resentencing. And unless there are questions, I'll proceed to the other part of the remand, which we would like and the government opposes, which is for a new trial. There were three troubling things that happened at the trial, in our view, and it had to do with the nature of the things the government did say and the government didn't say. I want to start by discussing the testimony of the cooperating co-defendant, Jose Sanabria Sanchez, because I think there's a disagreement as to how important that testimony was. His testimony was the key in the case. Mr. Flournoy was charged with a conspiracy and an attempt to possess narcotics. And when he was arrested, police officers had no idea who he was. They didn't know about his involvement prior to the arrest. The only explanation of the conspiracy, the relationship he had with Jose and the other person involved, Cesar, was explained by Jose at trial. Didn't the police observe Mr. Flournoy dumping the $200,000 into the seller's car? They did. That's right. And so that's some evidence that he was involved. Yes, it is. That's correct. But we don't know what his intention was when he was doing that. There are inferences that can be raised, certainly, but we don't know if Jose had been using him and saying, hey, do this for me so that other people see you doing this. We don't know where that money came from. We don't know Mr. Flournoy's connection to any of the deal but for Jose's testimony. And Jose's testimony then creates a compelling case against Mr. Flournoy at the trial. So when we talk about the importance of the contradiction where Jose testified to inconsistent versions of the same fact in two different proceedings, it's not trivial. This is not something that's immaterial. Jose's credibility was a very important part of this trial, and defense counsel emphasized that over and over. In his closing argument, the lawyer basically raised a reasonable doubt argument and said, you can't believe any of these witnesses. They're not credible. Their stories haven't been corroborated. That was the defense. The defense wasn't sort of an identity defense or an alibi defense or some other defense to be raised. There was nothing. There was no witnesses called by Mr. Flournoy, and Mr. Flournoy didn't testify. So when we talk about, then, the prosecutor's comments in closing argument. Before you go to that, just on Jose's comments, his plea agreement was turned over to the defense? It was, Your Honor. I can imagine there might be good reasons not to cross-examine Jose on that particular discrepancy. I don't think so. I mean, I think that the defense was his credibility. And if he's given a sworn statement in federal court that, in fact, he was the one who went back and manipulated all the money for this deal, and then comes to court in the trial and says, no, no, no, that was Mr. Flournoy. Right, but then if that attack is made, then the government gets to respond, right? Right, and they would be able to clarify and say, well, did you draft this plea agreement? No. Did you agree with it? Yes. Is it, in fact, true? But that's much better impeachment than what actually took place at the trial in terms of Jose, because essentially all Mr. Flournoy could do was say, well, he's a cooperator, he must be lying for a benefit. But there wasn't that proven inconsistent sworn testimony. I think that's incredibly powerful evidence. So this $180,000 is real money, isn't it? That's right. It was stacked $10,000. You know, the drugs weren't, apparently. The drugs were brown sugar, as I understand. It doesn't get very far. That's right. But it was $190,000, actually, wasn't it? I think the figure is $186,000 total, yeah. But, again, so that's part of the evidence. But Jose's testimony, I think, really was critical. And I think the real concern here is disclosure. As the Supreme Court has known, we prefer making this part of the record rather than trusting the prosecutor in their sort of private deliberations as to whether this should come up. It was disclosed, though, right? The plea agreement was. That's right. But when the prosecutor questioned Jose at the trial, it was not brought up. So, right, there may be a 2255 claim in the future on that score. But we think that it's better that the prosecutor first actually brings this up if he's going to offer testimony that contradicts testimony he had earlier elicited in a separate proceeding, because he's the only person who was at both proceedings. Mr. Flournoy wasn't at that first proceeding. He didn't have a transcript of that proceeding before the trial. And, again, the other thing I would stress is the Supreme Court's, again, made it clear. It's about the fairness of the trial. We're not talking about the culpability of the prosecutor. We're talking about did Mr. Flournoy have a fair trial. So moving to the closing arguments, I've tried to separate out in the brief, there are two related claims when it comes to missing witnesses. One is if you present, I wouldn't say an affirmative defense, but a defense that relies on identity or alibi or bringing in witnesses or presenting testimony, the government is certainly entitled to say that's a lame defense. You didn't support it with corroborating witnesses. You can't complain that the government didn't bring in witnesses to make your defense for you because your defense just fails. That's very different when there is no defense, and the government says, well, if they would have provided testimony for you, you could have called them. The defense is under absolutely no obligation to call those witnesses, and I think that the government misconstrued what Mr. Flournoy really was saying. So I think there's a distinction between commenting on the lameness of a defense and commenting on the lack of a defense. Counsel, the thing that concerns me about this is that seems like a pretty fine line in real life, and you're saying if you cross that line, a mistrial is required. Well, I don't think maybe that alone requires a mistrial. I think it's troubling. I think combined with the other errors that occurred in this trial that a new trial would be worth it. Okay, but you want us to police and want district judges to police what the prosecution can say in rebuttal depending upon the difference between a reasonable doubt defense and other sorts of defenses, right? Yes, I do. How sharp do you think that line is for people sitting in the courtroom as the case is going forward? Well, I don't think that it is a stretch to tell a prosecutor, be very cautious if you're going to make a missing witness argument, because you're stepping to the line. The prosecutor could have easily, and started, in fact, to say, well, we didn't need to bring in these witnesses. The witnesses we did provide provide adequate corroboration for what happened. That's all the prosecutor needs to say. If the prosecutor takes a step up to the line, then, yes, I do want policing of that line from the district court. And we already police it in terms of if the defendant is the only one who can rebut, right? Right, and that's, again, going back to Jose's testimony, he was the key to whether this was a conspiratorial relationship or not. The only other evidence that could rebut that would be Mr. Flournoy's testimony. He's the only other person who was allegedly there with Jose when all of this planning was taking place. The other thing I'll say is the missing witness argument, I think the problem is exacerbated when the government then says, and we wouldn't bring this case if we hadn't provided these facts, if these facts didn't rise to a level of reasonable doubt. I think that's really the, those two combined say, listen, there aren't any witnesses out there who are going to tell you anything else because we wouldn't bring this case if there were something like that. We don't bring cases on ifs and maybes. So those two comments in combination I think are more concerning than isolation and together I think denied Mr. Flournoy a fair trial. So I'll reserve the rest of my time. Thank you. Thank you, Mr. Anderson. Mr. McKenzie? Thank you, Your Honors. Good morning. May it please the Court, I'm John McKenzie for the United States. Your Honor, it's clear that Splendorio's comment about two can dance or both can go, both can argue applies here and the litany of cases that follow Splendorio. Once the defendant brings up the fact that the United States could have called a particular witness, the United States is entitled to respond. We're not hampered where we can't say, well, they have the same right to call that person. In this particular case, they badgered, I shouldn't say badgered, the defense counsel repeatedly went over the failure of the United States to call two particular Sheriff's Department employees. And the United States said, well, they have the ability to call them as well. They could have called them with a subpoena. Splendorio says that's fine. The cases following Splendorio says that's fine. You'd be making certainly new law to be able to say, well, we're going to now have, as Your Honor notes, we're going to refine that. So we're going to say, well, you can do that, but only off particular defense of reasonable doubt, as opposed to a defense of it doesn't make sense or it was unsupported or it was lame. As the Court notes, there's really very little way to kind of make that into a fine enough line where prosecutors and district judges and even defense counsel can follow that. As far as the impeachment of the cooperating witness, the defense counsel was given a copy of the plagiarism. Yes, it contained an error. The United States acknowledged that. A small error in that one part of it had the roles of Juan Sanabria and the defendant reversed. Every other document, every other piece of testimony showed what really happened, and that is it was the defendant who went back into his trunk and pulled money out of the well where there's a spare tire and put it in a bag. That's the only part of the trial where the plagiarism differs than the actual facts. The complaint had it correctly. The suppression hearing had it correctly. The government's response to the motion to suppress had it correct. The testimony at trial had it correct. The official versions had it correct. It was only the plagiarism that didn't, that made the mistake, and that was disclosed. So the defense counsel could have, had they wanted to, tried to impeach Sanabria with that. It's difficult to impeach individuals when you have an interpreter, and so you have to kind of pick your areas on where you want to impeach. Defense counsel decided apparently not to impeach in this area. Perhaps it was because the interpreter, perhaps not. We don't know. I have sort of a curiosity. That's an awful lot of money looking for drugs, and normally when you have something that size, it's a pretty much sure thing. You know what you're buying, what you're going to get, and you know who's selling it. I can understand if this were $5,000, they'd end up with brown sugar. But it's almost like somebody could even say it was a setup. But I don't know if it's necessary to look into all that. I guess it's mostly curious of how this amount of money can be chasing an unknown, I guess, seller. Well, that's why the defendant was able to go through the Sanabrias. He knew the Sanabrias, or at least he knew one Sanabria, from work and was introduced to his brother who said, I have a connection in Brockville. And so based upon that, he went. Defense counsel said the United States had no evidence of exactly what the defendant's role was when they came up on the scene. That's not really correct. As Your Honor noted, he pulls $180-some-thousand out of his car. But more importantly than that, his co-conspirator had already said, the other person in the car with my brother is the guy who's actually going to get the drugs. These are co-conspirator statements. And, in fact, when they arrived, there was talk about the other guy is the one who has the money and he's going to be having the drugs. Was he a dealer? Was he a seller? What's he going to do with all those drugs if they were real? Well, the charge was intent to possess or attempt to possess with intent to distribute. So that was the government's theory. There certainly was an indication by the presence of what the United States refers to as a kilo press that it was a large-level dealer. There's somebody who could break down kilograms, make them with mix, put them back in, and then have them re-bricked. Was that press determined that it really was that, and traces and all that stuff in it? So somebody was big time, I guess. Well, the chemist was able to say that there were traces of heroin and cocaine in it. And the expert testimony about drug trafficking techniques was able to say, other than a pan that was missing, and we don't know where the pan, there's no evidence of where the pan is, it was ready to go and could be used to re-rock and re-brick kilos. If there's nothing further, I'd rest my brief, Your Honors. All right. Thank you, Mr. McKinney. Thank you, Mr. Henderson. Judge Mannion, I think you brought up an interesting point, and it wasn't fully sort of elaborated upon at the trial. But there is some question as to the Santa Brias had established contact with the undercover officer, Juanez, to set up this deal. But Mr. Flournoy didn't know Juanez, and according to Jose's testimony, just knew the Santa Brias. And there is some question as to why Mr. Flournoy would dump $180,000 of his own money into a car of somebody he didn't know. That is a question that raises some problems, because it is such a large amount of money. There is a possibility, for example, that he was just going along with what the Santa Brias were doing, that that was actually their money. That's why, again, Jose's testimony is so critical in this case. But we'd ask to remand fully. Thank you, Your Honors. Thanks, Mr. Henderson. Thank you, Mr. McKenzie. Case is taken under advisement.